In this case, No. LA-5084, Sooner Harbor Ventures v. United States. Mr. Gies. Gies, thank you. Good morning, ladies. May it please the court, I am Billy Gies of the law firm Russian Gies, Biloxi, Mississippi. I represent Sooner Harbor Ventures, Inc., with me today is Lauren Sonnier, my firm, and this is our first appearance before this court. This is an appeal from an adverse ruling on a motion to assembly judgment. The standard review is to no vote. The case involves regulatory taking. Reportedly, I am advised... What was actually taken? What was the agreement for what? Because the trial judge stated that the parties jointly have agreed that the preliminary issue in this case is whether the plaintiff possessed, at the time of the alleged taking, a fifth-amendment consensual right to sell his property to the U.S. without any condition imposed upon the state. That is the inherent mistake in the trial court and the inherent mistake in the case. The right that was taken was not the right to sell to the Navy, but the right to sell to any party or use or develop the land without mitigation. But where in the record is there a disagreement with the statement made before the trial court? Do you disagree with the trial court's opinion? Yes, Your Honor. Where in the record is that? We disagreed, I believe, in our briefs. We disagreed in our arguments. And if the court please, I was going through and trying to make two points, but the first point is exactly that, is that we didn't get to the record, and the court made an assumption factually that I believe is a contested issue that should be decided in favor of the schooner harbor at this point, as there are no facts which have gone to that. We were limited in our briefing to this issue. But is there anything in the record where you disagree with the trial court's conclusion there that she said that the joint native agreed? Was there a joint agreement, a joint stipulation? Was the joint statement of issues of law the only agreement that you had? The joint statements of law are the only agreements that we had, Your Honor, to my knowledge. The issue that we believe that was misdirected is that the taking was not by the Navy, and the claim has never been that we can only sell to the Navy. The taking was by Fish and Wildlife Service. When they rendered their opinion in their letter of forms that this property was not subject to, if I'm remembering correctly, AA-0168, I believe it is, was not available for any development, and later that the property could not be used without mitigation, and I believe that could be found at AA-170. Mr. Fess, as I understand it, your contention is that the District Court, I'm sorry, the Court of Federal Claims, mischaracterized your contention below. You're saying, look, our property, which is 74.4 acres, what was taken, that was taken because one of the sticks in the bundle of property rights, namely the right to sell, had conditions put on it, right? Yes, actually two sticks, but it probably doesn't matter. You're saying you weren't allowed to sell it unfettered. Exactly. Now, the appendix doesn't have the briefs below, but I guess where you look to see what the contention was, if you look at 94, 98, and 100 of the appendix, that seems to be you, meaning your client, responding to interlocutories by the government. At 94, you say you had to give up all economically beneficial use of the property. Then at 98, when you're asked to describe the property that was taken, you give the whole 74.4 acres. Then at 100, the type of property interest allegedly taken, and you say fee simple. As far as the appendix we have, that's what we have, what I could find, to glean what you said below was the nature of the property interest. Yes, Your Honor. And there you're saying fee simple. Yes, Your Honor. At least the whole 74.4 acres gets back to what I said in your argument. I could give you a really interesting dance, but basically that's lawyers getting hoisted on their own guitar, and that we were trying, as trial lawyers tend to do, you get a general question, you give a general answer, so that you're not bound to one position. Correct me exactly. I'm sorry. I don't want to cut you off just in time to show, but in the joint appendix, am I correct that there's, I didn't see in here, and I'm assuming possible on this, I didn't see in the joint appendix copies of the briefs that were submitted below the Court of Federal Claims on this issue. I do not believe they're in the joint appendix, Your Honor. I just want to make sure I understand. But the rights that were being taken were twofold. The right to alienate was limited, and the right to exploit the property for benefit was limited by the Fish and Wildlife Service opinions. But your right to sell to the Navy is not what you're alleging. No, Your Honor. And therein we have to make a distinction, and that is what Judge Horne, and what is otherwise a relatively good, nicely written opinion, but ignored, is what happens with fish and wildlife. She only focuses on Navy, and I believe the Navy was appearing in its commercial capacity. They were the purchaser of the property, and that property was to be purchased with mitigation. Now, the problem is this, is that if we would substitute Navy for the term any commercial purchaser, we get the same result. We cannot use our property, in this case sell our property, without paying mitigation. Now, this... That's not payment of mitigation. You're complying with the requirements under the ESA, right? Yes, sir. Yes, Your Honor. Which means if we are to develop it, if we are to sell it to the Navy, to sell it to a third party, or want to use it for any purpose, some permit would have to be required. If you look at the terms placed upon fish and wildlife, that means mitigation. So it's not really a categorical taking of the property that you're alleging. You want a Penn Central type of analysis. It's a Penn Central type analysis. It's regulatory taking. It's one of the rights. It is not a per se taking under Lucas. It is not an actual physical taking under the prior cases. I think if we wanted to find two cases that were, in this circuit, analogous to what is happening, I think we should turn to the flyover cases. May I ask you another question? Yes, ma'am. It's easy to see that there were, let's call them regulatory restraints, placed on this property. But at the time your client acquired it, they knew it was adjacent to the refuge. Yes, ma'am. Is there a position that they thought that that was irrelevant and that there were no risks involved with development adjacent to the refuge? Yes, ma'am. It really is. If I may explain. Now, we did not, we took some discovery with this. It was not discovered as completely as it could have been, at least on the government's part. It was not the custom and practice, and our experts were prepared to testify to this, within South Mississippi to do due diligence with respect to protected species, et cetera, at this point in time. They purchased it near this refuge, which is a very large refuge, and they were able to sell, I think the facts relate, three separate sales out of this property, wherein this was not considered. They did not know that risk carried over to their property. They're not ignorant. They are not unsophisticated. Both of them, one's an engineer. One of the principals of the company, one's an engineer. The other is an experienced business person. But within our area, it was not considered that this would prohibit the use of property. And, in fact, the extent to which the protected species could come over was never within their consideration. Nor should it have been under the customs and practices that existed in South Mississippi for buying and selling real estate at the time. But wouldn't you think that a person interested in development would foresee that there would be a difference between, let's say, large individual lots, perhaps for single-family usage, and the high-density development that, after they didn't have to sell to the Navy... They didn't have to sell to the Navy. They could have sold it to someone else, but once the opinion was issued by Fish and Wildlife, it could not be done in any other manner without some permanent and man-made mitigation. You're saying that no further development on any zoning basis, if that's an appropriate usage, or I had the sense, although it isn't clearly developed in what I saw, that it was the density of the planned usage that was a factor, and that this could be lost as far as the refuge is concerned. I don't think the density was... I think the density, as a practical matter, is a factor. I would be foolish to say otherwise, because that would get people's attention. But I believe the Fish and Wildlife Service, in AA-168, they say the location of any development at this site would have a definite impact on cranes due to the displacement, nesting, foraging, and moose-poosting area. I don't think you could put a hunting shack out there. I don't think you could put... They have a little pond out there. I'm not sure that that would allow you to build piers for fly fishing. It says any development. So that's something I just came back to. What I was asking about, we don't have the briefs before the Court of Federal Claims in front of us, but if you can remember, if I did have your brief before the Court of Federal Claims in front of me, what would I see you saying about the nature of the property interest you're claiming? I think, hopefully, you'd see me saying exactly what I'm saying today, and that is we're not claiming a sale only to Navy. We're claiming a sale to any party. You're saying I would not... You're saying I would not see you saying... You're saying I would not see you saying that it's the property interest of the Court of Federal Claims. Yes. I think you would... What we said when you were trying to sell not to Navy, and that's where this goes awry, is that they're holding that we did not have a sole right to sue... to sell only to Navy, and that's never been the point. But the biological opinion that was obtained was only for the sale to the Navy. The biological opinion related only to the Navy because they requested it under their procedures. That is correct, sir. You never asked for any other type of permit application... No, sir. ...to sell to anybody else. No, sir. Which you would have to... We would. ...if you tried to sell to anybody... That is correct, sir. ...other than Navy. Yes, sir. So at that point in time, if there was a restriction placed on the property because of that permit, then the case would become ripe for an action against the federal government on a regulatory taking basis. However, prior to that, would the issue be ripe? Yes, Your Honor. On what basis? If you haven't tried to sell to anybody else, and the only restriction we have is based upon biological opinion that was issued for the Navy sale, and the Navy sale is one, maybe several that you may have. The ripeness issue. First, that was not raised by the court. That was not the basis of our opinion. That was raised by government in their briefs. However, I believe the ripeness issue, once we receive these opinions of Fish and Wildlife Service, it does not require us then to go and apply for useless permits in the future when we know what the result is going to be. Well, you don't know what that result would be until you apply for it. Well, Your Honor, a final decision, I believe you would find, occurs when the responsible agent determines the extent of permitted development on the land. That was determined. The responsible agent made that determination. I would suggest, Your Honor, to look at McDonald, Summers, and Fratts versus Yolo County 477 U.S. 340. That speaks to, I believe, the lack of necessity to go forward with useless permitting. We know what Fish and Wildlife said. It wasn't that simple. When it's futile, I think that the Supreme Court said it's a futility argument. Yes, Your Honor. We've taken action which might be futile. And I believe it would have been futile for our clients to go forward at this time. You don't know that for sure. I do not know that for sure. But there is a very reasonable, commercial, compelling reason for the clients to conduct a sale to the Navy at this point. Once they have this opinion from Fish and Wildlife, they know, anybody out there in commerce knows that in the future, they're going to be required to have some form of permitting which is going to require mitigation. They had available to them the opportunity through a three-party transaction to conduct mitigation at a somewhat reasonable price. They did not know in the future if mitigation would ever be available or available to them or at what price. I understand the argument of rightness but to compel them to roll that dice is both unreasonable and I think probably unfair. At least in this case, as the government keeps pointing out, they made a profit. Yes, ma'am. Let's hear from the other side. Yes, ma'am. Thank you, ma'am. Good morning. May it please the Court. Scooter Harbor here, as the Court has acknowledged, has realized, voluntarily sold its property to the Navy and it voluntarily included mitigation property in order to facilitate that deal. As the Court of Federal Claims explained, the plaintiff cannot now rewrite the terms of the agreement to take this claim. The federal government here, neither the Fish and Wildlife Service nor anyone else ever prohibited or ordered Scooter Harbor to do anything in particular or not to do anything in particular on the property. Mr. Geist focused on the Fish and Wildlife Service's actions here and that's what their brief largely focuses on. In the Court of Federal Claims, in the complaint, the focus, especially in the complaint, appears to be on what the Navy did in the Navy's terms of sale. But turning first to what the Fish and Wildlife Service did because that appears now to be what they're focusing on. The Fish and Wildlife Service only answered the question of what the Navy could do under the Endangered Species Act in a Section 7 consultation. And that consultation was on the Navy's specific proposal here, which was to develop 188 units of family housing. The Fish and Wildlife Service simply did not address the general question of whether any development could occur on the parcel or what form of development could or could not occur. It simply analyzed what the Navy was proposing to do. And it looked at that and reached the conclusion that that was permissible so long as the Navy included the mitigation property as well. So that Schooner Harbor is simply not correct to say the Fish and Wildlife Service here somehow prohibited any future development on the property. Yes. The Court of Federal Claims said that the property interest that Schooner Plain was taking was the right, quote, to sell its property to the Navy for the development of a housing project without conditions or additional financial burden. That's what the Court of Federal Claims said. Schooner was asserted. Now, Schooner comes to us and says, no, no, no, that's not what I asserted below. The Court of Federal Claims got it wrong. There's a number of places in their brief where they say that. Now, they say we weren't asserting that below. Now, in your brief coming back, you made the argument that the Court of Federal Claims, you know, correctly decided the case and so forth. But I didn't, and correct me if I'm wrong, but I didn't see you anywhere in your brief challenging Mr. Geis' assertion as to what was argued below. Like, he argues at pages 5, 7, 13, and 16 in his brief that here's what we argued below. And in your brief, you come back and, you know, you talk about the property interest at pages 14, 16, 17, 22, and 24, but you never sort of challenge his contention as to what he was arguing below. Well, I think both below and in this Court, they've argued it both ways. They've argued both that the sale itself with the inclusion of the mitigation property, that was a taking, and also the Fish and Wildlife Service's action is a taking. I think the Court below, however, if you read the entire opinion in the background section in the first few pages, it clearly understands exactly what happened here that the Fish and Wildlife Service did. It explains it. No, I understand. We're talking about those two. We're talking about defining the property interest. As we know, that's the first step in one of these takings analysis cases. And it does seem, I mean, I could be wrong, but it does seem that what Mr. Geis is saying, and this is a matter of the law, is perhaps a more correct definition of property interest than what the Court said. He had 74.4 acres of land. That's his property. And he is saying one of the sticks and one of the rights was taken, namely the right to sell that without conditions imposed on it. And then he's saying give me my pen central analysis. Now, he may not get anywhere on the merits of the case, but it does seem that he's asserting the correct property interest, and I'm a little bit concerned about the way the Court of Federal Claims characterizes the property interest. And that's the way the case went off. Well, I have a couple of responses. One, the Court of Federal Claims, the way it can describe the property interest, it mentions in there that, I don't have the language right here, but I believe it's without conditions. And those conditions, what it's talking about there is both the Navy's condition mitigation property and the Fish and Wildlife Service's. You know, it does say that, but then it says, but then it does say without conditions, but then it goes on and says here's the property interest that's being asserted, and it doesn't define it that way. And it decided the case on that basis. Well, it said it didn't have a cognizable property interest. And it does seem that there is a cognizable property interest named in the land. So, he meets the first step in the analysis. Now, on the merits, he may lose. I don't know. Well, I think the Court both defined the property interest in the way you've mentioned it, but then went on to discuss that the actions actually occurred here. And... You're saying it was a Penn Central analysis? Well, it doesn't apply to Penn Central, but it goes to the point of, and we've explained this in our brief, that the actual rights that they claim to be infringed, alienation, the right to alienation, as well as the right to develop their property, there's no, there's nothing in the record here. But he's saying, you know, he's saying, I was able to sell it, but I had to sell it with these conditions that were imposed on it, and that affected the regulatory thing. Again, that claim may fail on the merits, but it does seem that based on the issue the Court decided the case on, namely whether there was a cognizable property interest, he may have a valid argument. Well, I think you're right. The Court defined it cognizable property interest in that way. I think the record is clear and the facts are not disputed. All the facts are set forth in the parties' joint statements of facts below. And those facts establish that there's been no infringement of the right to alienation, and no taking of the right to develop. Well, that's an issue on the merits. And it may well be that he'll lose on that. And I think this Court can reach that if, based on the record here, because those facts are not disputed. The parties here have argued the question of whether there's any infringement on development rights here or any restriction on the right to alienation. They were able to sell the property, both three parts of it to private developers, and the rest of it to the Navy. There's no sign here that they weren't able to sell. And if you look at the record with respect to the biological opinion of the Fish and Wildlife Service, there's nothing in there that says that any way restricts the right to alienation or bars development of the property. Those three pieces, they sold it. I've heard the Navy insisting on a mitigation purchase and that it be paid for by the property owner, not by the government. That's right. The Navy insisted on that to satisfy the Navy's obligations on the Endangered Species Act. But if the Navy had just backed away from this property entirely, there's nothing in the record that prohibits Schooner Harbor from developing a property as it wants to, but for the existence of the Endangered Species Act and the existence of the designated critical habitat, both of which date back to 1970s, well before they purchased the property. And those restrictions, if there is any restriction here, as Judge Guzzardo was explaining and mentioning earlier, would only be fleshed out if they applied for an incidental take permit and said, look, this is what we want to do with our property. You, the government, can you please help us and let us know whether that will take the endangered crane or not? If they had done that, we would then have an answer to whether there was a restriction or not, if there was an incidental take permit issued or not, and we would know then what restriction there would be on a private development that they were considering. But instead, all we have is the biological opinion between the Navy and Fish and Wildlife Service. While that influences the Navy's behavior, and the Navy behaved in accord with it by purchasing the property and including the navigation property and requiring Schooner Harbor to purchase it in order to complete the voluntary transaction, that biological opinion does not force Schooner Harbor or limit Schooner Harbor's development in any way. And I think it's just not correct when Mr. Geis is arguing that it prohibits development. It just doesn't, and those processes... Let me ask you one more question. Go ahead. Okay. What do you say is the property interest? Well, what I first say is the property interest is the way I read their complaint. And it's a little confusing, but it's, we want to sell the property without restriction. You say they don't have the property, the land isn't the property that's involved. Well, I don't think that's how they framed the case below. And that is clearly how they're framing it now. I think... However you frame it... What about what we looked at where it said what's the property? That document I looked at, we don't have the briefs below, but in the discovery document that we looked at, I think at page 100, it said what's the property that's involved? Here it says it's 74.4 acres of land. Right. I think that... I mean, isn't that the property? Right. I mean, that... If I had pled this complaint, well, I would never have pled this complaint, but if I had, I think that's how you have to define... You've advanced some arguments here that may well be very persuasive in the setting of a Penn Central analysis, namely reasonable investment-backed expectations and so forth. Again, the case wasn't decided on that basis. The case was decided on the basis that he not asserted cognizable property interests. That's what we have to look at. Well, I think you could both... I think there's two responses to that. One, that was based on the complaint file in this case and the way the case was presented below. That's the Court of Federal Claims looked at the way Scudo Harbor was presented at the base at the time. The complaint you cited... But the court still has to define the property interest record. Whether something's a cognizable property interest is an issue of law. It is an issue of law, but if somebody comes to court and says, my cognizable property interest is the right to sell the Navy without precondition, and the court says... That's not necessarily what he's saying. He says, he's got the land there, and I was... My right to freely alienate it was impinged on. Right. And I understand that's the argument being made now. I don't think that's how the complaint framed it, and that's how I think it ended up in the Court of Federal Claims framed like it was. I do think, though, on this record, given that there's a joint stipulation of facts... I'm sorry. I fogged up on your tone. You just go to us and ask another question. The question was, the cognizable property interest with respect to the decision that was made by the court below, is it really a taking of the right to sell to the Navy, which is a property interest, as Judge Charles was pointing out, or is it the underlying property itself? There's no property right to sell to the Navy, is there? No. So that's not a property right? Right. That's not a property right. Property right is the underlying acreage of land. That would be a property right if they were claiming that that was infringed. Our argument is that there's no evidence here at all that that underlying property was taken. There's no infringement by the Fish and Wildlife Service's biological opinion, and there's no infringement by what the Navy did here, which is offer them twice as much money as they paid for it two years earlier, and they accepted it. Aside from that, with respect to the characterization by the trial court, if we hypothetically decide that that was a mischaracterization and sent it back, you just have to go through the Penn Central analysis to make a determination at that point. I think that's right. If it went back on that ground, then it would be teed up to the Penn Central analysis. I don't think it has to go back on that ground, because I think the court can look at the Jones stipulation of facts here and see that there's no possible claim for a taking here based on those facts. I think that as a matter of law, it was established that the Fish and Wildlife Service's opinion did not affect the taking, but in any event, a challenge to Fish and Wildlife Service's actions here would not be right, because there's been no application for appointment by Skinner Harbor, and the other point is that the distinction between the government acting as a bridge and the  acting as a bridge. If it runs after that point, if it does get remanded to the lower court at this point, would they have to apply for a permit before they could bring a takings claim? I think if it was remanded to the lower court, our argument would be just like we've argued here, that it's not right on this current record. They have crossed that bridge. They have the arrangement, the financial arrangement that was made for pragmatic reasons, so we know what happened. We know the consequences of the ruling with respect to litigation. It's not a matter of what might happen sometime in the future. We know what's happened in the past. Well, we only know the consequences. Well, we only know the consequences of the Navy's consultation with the Fish and Wildlife Service about the Navy's proposed development, and the Endangered Species Act applies differently to federal agencies than it applies to private parties, and that's why a private party needs to apply for an incidental take permit to assess what its actions are going to take the species under Section 9 of the Endangered Species Act. In contrast, Section 7 of the Endangered Species Act applies to federal actions like the Navy's action here, and that has a different set of restrictions on what the Navy can do, especially in the context of designated critical habitat. None of that came to pass and so the Navy required, the Navy could have bought the $300,000, but I forget how many acres, in mitigation. Instead, they required the property owner. Well, they didn't require anything. They said, if you want us to buy your property, here's what you're going to have to do. And the student harbor said, yes please, we'd like to do it. The only deal you can now get because of the Endangered Species Act is the only deal you can get from us. The only deal you can get from us because of the Endangered Species Act. That's what the Navy said. But that's a critical distinction in that it's not, it was not a case where they said, the Endangered Species Act only allows you to do this student harbor. It said, this is the only deal you can get from us. We don't know the answer to the question of what student harbor could or could not do absent the sale to the Navy here, except for what's in the record, which is they're able to sell three parts of their property for a combined $430,000 without any Endangered Species Act application at all. So the record shows that either the Endangered Species Act doesn't apply at all or it just applies to the Navy here. But there's nothing there showing that it was applied to student harbor before they urged the Navy to make this deal and the Navy made the deal and then the taking of this claim materialized after they closed the deal and received their property. I think it's extraneous as to whether once that ruling is made it could be ignored in any development or at least any development that's going to complete itself with the Navy responding because that isn't what happened. We have the facts and the real question is, and we know why, is it insecure for the public benefit to protect endangered species? So the real question is again, on this ruling or whether under Penn Central there would be any recovery? I think those might be the right questions but I think it is, I think there is a critical distinction here between what the Fish and Wildlife Service said. It said that it applied the Endangered Species Act to the Navy's action, not to Schumer Harbor's action and that biological opinion simply does not prohibit development on that land. It simply addresses the Navy's proposal and it's a different section they're applying that doesn't apply to private property. I don't have the impression that they're saying that because they're going to build to house 188 families therefore mitigation is required whereas if you're only going to sell one acre lots, no mitigation is required and I don't think there were any cautions or caveats in the future in that ruling once it came to their attention. Right, that ruling was about what the Navy has to do under the Endangered Species Act, Section 7, which restricts how the Navy can impact critical habitat. Those same restrictions do not apply in the same way under Section 9 of the Endangered Species Act, which is what would apply to student harbor and any other private party out there. So the answer to how that applies... We don't know that, right? We don't know that because they never applied for it. I would think that any businessman worth his soul would take some of the risks that you're now saying. But anyway, that's not before us. Okay, any more questions? Thank you. If you please support, I'll try to address a couple of questions we'll pose quickly. The last point Judge Newman was making, I would call your attention to AA00170 of the Appendix and particularly the line that's posed. If land remains in private ownership use of that land, e.g. development, would result in take of cranes that take would be prohibited. And that was from the opinion and basically are telling us if you keep it in private ownership, it is prohibited to take and take is defined as anything that would harass, disrupt the breeding, feeding, sheltering of the Samuel cranes. So I believe that speaks generally. I think we have a ruling from them as to what the position would be. I would call the Court's attention to the complaint that is attached to as a part of the Appendix, AA21, 23, and 25, particularly paragraphs 1, where we  concerning the United States Fish and Wildlife Service and their opinion. Paragraph 10, concerning the, again, we speak to this issue of mitigation with fish and wildlife and paragraph 21, as we say, as a result of U.S. F&W's determination under the Endangered Species Act and so forth. I believe that in my opinion there's more to the complaint than one. Oh, there's much more and I would ask the Court to go to the record and they were under notice of what the claim was. So we understand you're constrained by our rules as to what can be put in the appendix. Do you have any other requests for submission and addition? If you answer another question posed to me earlier concerning the due diligence and knowledge of what would happen with respect to being next to the sandhill crane. The first time there was a request for Fish and Wildlife Service about endangered species at this site, they didn't even mention sandhill cranes. Their first letter spoke to gopher tortoises and certain other species. It didn't even discuss sandhill cranes. It wasn't until the record reflects that people at the refuge wrote and said what about us? And then they become important. So I believe that the agency in charge of this didn't even look to how this was going to impact sandhill cranes until it was later called to their attention. And should these two businessmen have any greater burden even in this agency? My suggestion would be no. I think as I indicated earlier that the policy and the Brown decisions control what should happen here more than two decisions cited in the court and the government and that's the American Pledge and the Conti case both of which are fishing licensing cases and that was the basis of when she ruled was the fishing licensing analogy. I believe that's wrong. I think it is a taking apart the bundle of rights dealing with real property. I think Conti and American Pledge actually in their own terms distinguished themselves in real property cases. Unless the court has any other questions of me, I thank the court for the opportunity to be here and make these arguments. I was told always tell the court what you want. We respectfully pray that this case be reversed and sent back to the trial court for proceedings in the matter of a court court trial. Thank you very